**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MERRELL and LUCILLE WITT, EUGENE | § | |
| and SHARON WITT, PAULA and LARRY | § | |
| PIGG, and JOSEPH and DEBORAH | § | |
| CAMPBELL, Plaintiffs, Individually and on | § | |
| behalf of all others similarly situated, | § | |
| | § | CIVIL ACTION NO. 2:10-cv-22-TJW |
| Collectively, the CLASS, | § | |
| | § | |
| v. | § | |
| | § | |
| CHESAPEAKE EXPLORATION, L.L.C., | § | |
| CHESAPEAKE ENERGY CORPORATION | § | |
| and CHESAPEAKE OPERATING, INC. | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Class Certification (Dkt. No. 37). In their motion, named plaintiffs Merrell and Lucille Witt, Eugene and Sharon Witt, Paula and Larry Pigg, and Joseph and Deborah Campbell (collectively, "Plaintiffs") ask the Court to certify a class under Rule 23(c) of the Federal Rules of Civil Procedure for damages as a result of Defendants Chesapeake Exploration, LLC ("Chesapeake"), Chesapeake Energy Corporation ("Chesapeake Energy"), and Chesapeake Operating, Inc. ("Chesapeake Operating") (collectively, "Defendants") alleged failure to pay the lease bonus consideration owed class members under mineral leases as well as interest on those lease bonus amounts that were paid untimely. The Court held a hearing on Plaintiffs' motion on August 11, 2011. Having considered the briefing and arguments of the parties, the evidence provided, and the applicable law, the Court DENIES Plaintiffs' Motion for Class Certification for the reasons discussed below.

## I.    Background

Plaintiffs bring this putative class action as a result of Chesapeake's alleged breach of over 500 oil and gas leases in Texas. Plaintiffs allege that the leases at issue were form leases prepared by Chesapeake, offered to the lessors of Texas minerals by Chesapeake, executed and delivered by those lessors to Chesapeake (or its agents), and filed of record in the county clerks' offices by Chesapeake (either in full or by Memorandum of Lease). Plaintiffs further allege that the minerals were transferred to Chesapeake by delivery of the executed leases, but that Chesapeake uniformly did not pay hundreds of lessors their full bonuses as and when they became due. Plaintiffs have provided copies of roughly 517 executed leases.[1] One of Chesapeake's land brokers, Pangaea Land Services ("Pangaea"), was ordered by Chesapeake to file the leases within 48 hours of being executed.[2] However, Chesapeake offered evidence that it was using a number of different brokers, including Pangaea, during the relevant time period,[3] and Plaintiffs have offered no evidence as to the practices of these brokers. Of the 517 leases included as part of the class certification evidence, Plaintiffs' Summary of Identified Class Members indicates that 487 leases or memorandum of leases were filed in the appropriate county.[4] Plaintiffs allege that Chesapeake made a decision to breach its contractual obligations to pay agreed lease bonuses to lessors by unilaterally refusing to pay the full lease bonuses, or delaying payments of bonuses, to hundreds of lessors because of economic concerns that had nothing to do with the terms of the leases. According to Plaintiffs' summary, 337 potential class members were paid late or were not paid their entire lease bonus, and 134 potential class

---

[1] *See* PX 7 (containing roughly 517 executed leases).
[2] PX 100, Deposition of Scott Beckman at 36:22-37:11.
[3] PX 92, Deposition of Tyler Beaver on October 7, 2009, at 15:22-25.
[4] *See* PX 6, Summary of Identified Class Members at p.20 (stating that there are 337 potential class members whose leases were filed but were paid later or underpaid and 134 potential class members who were not paid their lease bonus at all).

members were never paid their lease bonus.[5]  To support the assertion that Chesapeake made a unilateral decision to breach the leases for economic reasons, Plaintiffs cite the testimony of Chesapeake's 30(b)(6) designee, Tyler Beaver, in a state court case filed by the named plaintiffs against Chesapeake Exploration, LLC and Pangaea Land Services, LLC, Case No. 90-0180 in the District Court Harrison, County, Texas, 71st Judicial District.[6]  In that case, Mr. Beaver testified that the reason the drafts of the named plaintiffs were dishonored and that Chesapeake decided to decrease the bonus prices been offered was because of the economic crash and the drop in gas prices.[7]  Plaintiffs allege that, as to each class member, Chesapeake agreed in drafts given to lessors that "[a] cashiers check made payable to your bank will be mailed upon the expiration of the waiting period (days) indicated on the front of the draft."[8]  Plaintiffs allege that Chesapeake's failure to pay the full lease bonuses or to pay them timely constituted a breach of the leases by Chesapeake.

With respect to the named plaintiffs, Plaintiffs allege that, in the summer of 2008, Chesapeake, through its broker, Pangaea, contacted Plaintiffs about Chesapeake's desire to lease their minerals.[9]  Plaintiffs claim that the landmen working on behalf of Chesapeake offered Plaintiffs the same lease terms using the same printed oil and gas lease form.[10]  The lease bonus varied according to the interest owned by each Plaintiff.[11]  Plaintiffs claim that the lease bonus was generally a multiple of lessor's net mineral acreage and a price per acre, but Plaintiffs provide no citation to the record for this claim.  The named plaintiffs executed and delivered to

---

[5] *Id.*; *see also* PX 7.

[6] PX 92, Deposition of Tyler Beaver on October 7, 2009.

[7] PX 92, Deposition of Tyler Beaver on October 7, 2009, at 19:25-20:20, 26:21-24, and 66:4-20.

[8] *See* PX 1B, Merrell and Lucille Witt Draft at 1B-2; PX 2B, Eugene and Sharon Witt Draft at 2B-2; PX 3B, Paula and Larry Pigg Draft at 3B-2; PX 4B, Joseph and Deborah Campbell Draft at 4B-2.  Each of these Drafts contains the quoted language.

[9] Dkt. No. 106, Testimony of Merrill Witt at Class Certification Hearing, Transcript of Class Action Hearing held on August 11, 2011 ("Hearing Transcript"), at 57:7-10.

[10] PX92, Deposition of Tyler Beaver on October 7, 2009 ("Beaver Depo 10/7/09") at 32:10-22.

[11] *Id.* at 31:6-11.

Chesapeake, via its broker, the mineral conveyances (Paid-/up Oil and Gas Leases), and placed the "drafts" for collection with their respective banks. Each of the leases of the named plaintiffs was filed of record.[12] Each Paid-Up Oil and Gas Lease for the Plaintiffs states "[i]n consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land . . ."[13] None of the leases describes the amount of the lease bonus.[14] However, each named plaintiff was provided with a bank draft for a specified amount that states that it is "[i]n payment of Consideration for Oil and Gas Lease" and is "[p]ayable on or before 45 business days sight with approval of title and form of _____ agreement."[15] Each draft was also accompanied by "Instructions for Draft" which stated "A cashiers check made payable to your bank will be mailed upon the expiration of the waiting period (days) indicated on the front of the draft."[16] However, after the Plaintiffs presented their bank drafts for payment, Chesapeake refused to pay the lease bonus indicated on the respective bank drafts and instead proposed to pay a discounted lease bonus, equivalent to pricing at $5,000 per acre for the various leases. [17] Plaintiffs allege that when the named

---

[12] Dkt. No. 87, Complaint at ¶ 22, 31, and 39.

[13] *See* PX 1A, Merrell & Lucille Witt Paid-Up Oil and Gas Lease ("M&L Witt Lease") at ¶ 1; PX 2A, Eugene & Sharon Witt Paid-Up Oil and Gas Lease (E&S Witt Lease) at ¶ 1; PX 3A, Paula & Larry Pigg Paid-Up Oil and Gas Lease (Pigg Lease) at ¶ 1; PX 4A, Joseph and Deborah Campbell Paid-Up Oil and Gas Lease (Campbell Lease) at ¶ 1; and PX 11, Chesapeake Form Paid-Up Oil and Gas Lease ("Form Lease") at ¶ 1.

[14] *Id.*

[15] *See* PX 1B, Merrell & Lucille Witt Bank Draft at 1B-1; PX 2B, Eugene & Sharon Witt Bank Draft at 2B-1; PX 3B, Paula & Larry Pigg Bank Draft at 3B-1; and PX 4B, Joseph and Deborah Campbell Bank Draft at 4B-1.

[16] PX 1B, Merrell & Lucille Witt Bank Draft at 1B-2; PX 2B, Eugene & Sharon Witt Bank Draft at 2B-2; PX 3B, Paula & Larry Pigg Bank Draft at 3B-2; and PX 4B, Joseph and Deborah Campbell Bank Draft at 4B-2.

[17] *See* PX 1C, Merrell and Lucille Witt Acknowledgement, Draft, and Bank of Oklahoma Documents at 1C-2 (stating that draft "canceled for renegotiating price per acre"); PX 2C, Eugene and Sharon Witt Acknowledgment, Draft, and Bank of Oklahoma Documents at 2C-2 (same); PX 3C, Paula and Larry Pigg Acknowledgement, Draft, and Bank of Oklahoma Documents at 3C-2 (same); PX 4C, Josepha and Deborah Campbell Acknowledgement, Draft and Bank of Oklahoma Documents at 4C-2 (same); *see also* Dkt. No. 106, Testimony of Merrell Witt at Class Certification Hearing, Hearing Transcript at 57:19-21 ("[a]fter 45 days, I asked the bank, 'What's going on? Where is our money?' And they contacted Oklahoma bank and said they're not going to honor it. They're going to renegotiate, which was a surprise to me."); PX 97, Deposition of Gary Dunlap ("Dunlap Depo") at 103:23-105:8 (describing change in Chesapeake's policy regarding payment of bank drafts in roughly October 2008); PX 91, Deposition of Tyler Beaver on January 21, 2011 ("Beaver Depo 2/21/11") at 76:8-18 (describing decision by Chesapeake to pay $5,000 per acre for lease bonus for leases filed of record and $1,500 per acre bonus for leases not

plaintiffs refused to accept a partial payment of the lease bonus owed them, Chesapeake refused to pay any bonus.[18]

Chesapeake has provided evidence that different land brokers working for Chesapeake during the relevant time period used different form bank drafts.[19] Despite the different forms, all of the bank drafts contain language similar to the following: "Payable on or before ___ business days sight with approval of title and form of _____ agreement;"[20] or "On approval of lease or mineral deed described hereon by drawee not later than __ banking days after arrival of this draft at collecting bank;"[21] or "The below consideration shall be tendered subject to the approval by Drawee/Lessee of the Oil, Gas and Mineral Lease described herein, and upon approval of title by same Drawee, not later than FORTY-FIVE (45) business days after execution and delivery of this voucher to Drawee's Offices;"[22] or "Not longer than __ banking days after sight but on approval of the instrument described hereon and/or upon approval of title of same."[23] Some of the drafts also include additional language similar to the following: "In the event this draft is not paid within said time, the collecting bank shall return the same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto;"[24] or "Recordation of the instrument is not a waiver of the approval conditions."[25]

The members of Chesapeake are Chesapeake Energy Corporation ("Chesapeake Energy" or "CEC") and Chesapeake Operating, Inc. ("Chesapeake Operating" or "COI").[26] Chesapeake

---

filed of record); PX 95, Deposition of David Brooks ("Brooks Depo") at 69:1-70:8 (describing directive from Chesapeake in October 2008 to reduce payment of lease bonuses to $5,000 per acre).
[18] See Dkt. No. 106, Testimony of Merrell Witt at Class Certification Hearing, Hearing Transcript at 57:22-24 (testifying that he has never been paid any money by Chesapeake).
[19] *See* DX012, Sample Bank Drafts.
[20] DX012 at CHK00183373.
[21] DX012 at ALS00000028.
[22] DX012 at PALOMA00000081.
[23] DX012 at CONF_CHK00188524.
[24] DX012 at ALS00000028.
[25] DX012 at CONF_CHK00188524.
[26] Dkt. No. 87, Complaint at ¶ 3 (stating that the members of Chesapeake are Chesapeake Operating and Chesapeake

Energy, the publicly traded entity, is a producer and driller of wells.[27] Chesapeake Operating is

an operating company affiliated with Chesapeake and Chesapeake Energy that, for at least 2009

and 2010, controlled the bank account from which the drafts at issue were paid.[28] Plaintiffs

allege that Chesapeake Energy and Chesapeake Operating tortuously interfered with the existing

obligations of Chesapeake to pay lease bonuses and seek class relief against Chesapeake Energy

and Chesapeake Operating for tortious interference.[29]

Plaintiffs allege that, in October 2008, employees of Chesapeake were given a directive

not to pay lease bonuses over $5,000 and then later not to pay lease bonuses at all.[30] However,

on October 10, 2008, Aubrey McClendon, the CEO of Chesapeake Energy, sent a letter to all

employees that Chesapeake was in a strong position financially with over $1 billion of cash in

hand.[31] Chesapeake Energy also paid Mr. McClendon a $75 million incentive bonus at the end

of 2008.[32] Plaintiffs contend that Chesapeake Energy focused on maintaining the value of its

share price in the stock market and exhausted its line of credit to have cash available for

operations, rather than honor Chesapeake's obligations to the lessors as the lease bonuses came

due. Also, Plaintiffs allege that Chesapeake Operating held the money, and while knowingly

committing Chesapeake to payment of the lease bonuses by utilizing its employees, when time

arrived to pay the lessors their lease bonuses, Chesapeake Operating refused to fund the

payments and instructed the Bank of Oklahoma to return the Chesapeake drafts unpaid.

---

Energy), Defendants' Answer to Third Amended Complaint at ¶ 3 (admitting allegations of paragraph 3 in Third Amended Complaint).

[27] *See* PX15, Chesapeake Energy Corp. 10-K, December 31, 2008, at 15_Page_005.

[28] *See* PX 100, Deposition of Mindy White at 11:14-17 (testifying that in the two years prior to December 31, 2010, the Bank of Oklahoma used Chesapeake Operating's bank account to pay the bank drafts),

[29] Dkt. No. 87, Complaint at ¶ 60.

[30] *See* PX95, Brooks Depo at 69:1-70:8.

[31] PX55, Aubrey McClendon Email to Chesapeake Employees dated October 10, 2008 at 55-1.

[32] PX17, Chesapeake Energy Notice of Annual Meeting of Shareholders on June 12, 2009, at 17_PAGE_02.

Chesapeake, however, argues that there was no company-wide decision to dishonor all drafts. In support of this, Chesapeake provides evidence that it honored payment on roughly 4,419 bank drafts between September 2008 and April 2009.[33] Chesapeake argues that during the relevant time period, i.e. the financial crisis, "every transaction stood on its own and had to be evaluated."[34]

In the alternative, Plaintiffs allege that if the oil and gas leases for those class members who were never paid any lease bonus by Chesapeake are found not to be effective or binding or not to have conveyed minerals, then Chesapeake fraudulently claimed an interest in the real property of Plaintiffs by recording the leases, in violation of Chapter 12 of the Texas Civil Practice and Remedies Code.

## II. Proposed Class Definition

Plaintiffs seek certification of the following class:

> All persons and business entities who executed and delivered an oil and gas lease of unleased minerals located in the State of Texas to Chesapeake Exploration, L.L.C or its leasing agents ("Chesapeake") naming Chesapeake as Lessee between March 1, 2008 and July 1, 2009 and to whom Chesapeake failed to pay, partially paid or untimely paid their respective lease cash bonus. Excepted from the class are: (1) all individuals, corporations, agencies, departments and instrumentalities of the State of Texas and the United States of America; (2) all persons who have signed a release in favor of Chesapeake for the relief requested herein; and (3) all persons' who have filed or obtained judgment in lawsuits requesting the relief requested herein.

Plaintiffs propose that the class be broken into three subclasses:

(1) Lessors who received no lease bonus (estimated 173 members)[35]

(2) Lessors who received only a part of the lease bonus due (estimated 86 members); and

(3) Lessors who were not paid their full lease bonus timely (estimated 258 members).

---

[33] DX013, Spread Sheet of Honored Bank Drafts between September 2, 2008 and April 29, 2009.
[34] DX011, Deposition of Henry J. Hood ("Hood Deposition") at 61:21-62:2.
[35] The number of prospective class members in each subclass comes from Plaintiffs' own summary of the prospective class members contained in PX 6 and differs from the estimated number of potential class members for each subclass contained in Plaintiffs' Motion for Class Certification.

Plaintiffs seek actual and punitive damages, attorneys fees, and declaratory relief. Specifically, Plaintiffs request that the Court "declare the validity, rights, obligations, and other legal relations of the parties to the contracts (oil and gas leases) between members of the Class and Chesapeake, that Chesapeake breached its obligation to pay members of the Class the lease bonus amounts originally agreed upon in the respective contracts, that the Class members are entitled to recover their full measure of damages . . ."[36]

## III.    Legal Standard

The class certification determination rests within the sound discretion of the trial court, exercised within the constraints of Federal Rule of Civil Procedure 23. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264 (5th Cir. 2007).   The party seeking certification bears the burden of establishing that all requirements of Rule 23 have been satisfied." *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).   "Rule 23 does not set forth a mere pleading standard.   A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (original emphasis).

Before granting certification, a court must conduct a rigorous analysis to determine whether the plaintiffs have met the Rule 23 requirements. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and the "rigorous analysis" required of the court may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 131 S.Ct. at 2551 (quotation and citations omitted).   Although class certification hearings "should not be mini-trials on the merits of the class or individual claims . . .

---

[36] Complaint at 27-28 (Dkt. No. 87).

going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (citation omitted). This requires the Court to examine the parties' claims and evidence and to "find, not merely assume, the facts favoring class certification." *Id.* (quotations and citations omitted). The Court has an independent duty to determine the propriety of the class certification and is not limited to the arguments made by the parties. *See Daniels v. City of New York*, 196 F.R.D. 409, 413 n5 (S.D.N.Y. 2001); *Anderson v. Cornejo*, 2000 WL 286902, at *3 (N.D. Ill. 2000). However, a district court cannot deny certification based on its belief that the plaintiff could not prevail on the merits. *Castano*, 84 F.3d at 744 (citing *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)).

Because a district court maintains great discretion in certifying and managing a class action, a district court's decision to certify a class will be reversed only upon a showing that the court abused its discretion, or that it applied incorrect legal standards in reaching its decision. *James v. City of Dallas, Texas*, 254 F.3d 551, 562 (5th Cir. 2001).

To certify a class under Rule 23, Plaintiffs must show that their proposed class meets all of the requirements of Rule 23(a) and the requirements of at least one of the subsections of Rule 23(b). *See* FED. R. CIV. P. 23. Under Rule 23(a), the proposed class must be so numerous that joinder of all members is impracticable ("numerosity"); there must be questions of law or fact common to the proposed class ("commonality"); the claims or defenses of the representatives must be typical of those of the proposed class ("typicality"); and the representative parties must fairly and adequately protect the interests of the proposed class ("adequacy"). FED. R. CIV. P. 23(a); *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004).

Plaintiffs seek certification of a damages class pursuant to Rule 23(b)(3). Rule 23(b)(3) allows for certification of a class of individuals if the Plaintiffs meet their burden of "demonstrating both (1) that questions common to the class members predominate over questions affecting only individual members ['predominance'], and (2) that class resolution is superior to alternative methods for adjudication of the controversy ['superiority']." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003); *see also* Fed. R. Civ. P. 23(b)(3). The predominance inquiry is "more demanding than the commonality requirement of Rule 23(a)" and requires courts "to consider how a trial on the merits would be conducted if a class were certified." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) (quoting *Bell Atlantic*, 339 F.3d at 301-02). This requires the Court to identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class. *Bell Atlantic*, 339 F.3d at 302. If the court determines that the issues before it would cause the proposed class to "'degenerat[e] into a series of individual trials,'" class certification is inappropriate. *Id*.

## IV. Discussion

### A. Breach of Lease and Tortious Interference Claims

The primary issue for certification of the breach of lease claim against Chesapeake and the tortious interference claim against Chesapeake Operating and Chesapeake Energy is whether predominance is met under Rule 23(b)(3). The predominance inquiry is "more demanding than the commonality requirement of Rule 23(a)" and requires courts "to consider how a trial on the merits would be conducted if a class were certified." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) (quoting *Bell Atlantic*, 339 F.3d at 301-02). This requires the Court to identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class. *Madison*, 637 F.3d

at 555; *Bell Atlantic*, 339 F.3d at 302. If the court determines that the issues before it would cause the proposed class to "'degenerat[e] into a series of individual trials,'" class certification is inappropriate. *Bell Atlantic*, 339 F.3d at 302. "Determining whether the superiority requirement is met requires a fact-specific analysis and will vary depending on the circumstances of any given case." *Madison*, 637 F.3d at 555 (citing 7AA WRIGHT, MILLER, & KANE, FEDERAL PRACTICE & PROCEDURE § 1783 (3d ed.2005)).

Plaintiffs argue that class issues predominate because Chesapeake tactically and uniformly broke its contractual obligations and refused to pay the lessors the lease bonus agreed upon from minerals leased to Chesapeake. Plaintiffs assert that Chesapeake utilized its printed lease forms for all members of the class, containing the same essential elements to effectuate a conveyance. Chesapeake's form leases recite that the "lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory . . ."[37] Thus, Plaintiffs argue that Chesapeake was conveyed a leasehold estate effective on the date each lease was executed, but Chesapeake failed and refused to pay the consideration for that conveyance because of economic considerations that had nothing to do with the terms of the individual leases. However, the evidence presented by Plaintiffs does not demonstrate that Chesapeake made one, unilateral decision to breach the leases of every member of the class. Based on the Court's review of the record, it is clear that Defendants paid thousands of bank drafts during the relevant time period.[38] Additionally, the evidence demonstrates that various circumstances surrounded the cancellation or delay in payment of at least some individual drafts. For example, the lease and draft documents for the potential class members demonstrate that some of the drafts were not paid because:

---

[37] *See* PX10, Chesapeake Form Paid-Up Oil and Gas Lease at 10-2; PX11, Chesapeake Form Paid-Up Oil and Gas Lease (No Surface Use) at 11-2.

[38] DX013, Spread Sheet of Honored Bank Drafts between September 2, 2008 and April 29, 2009.

- there were defects in title;[39]
- the individuals had already leased their property to another company;[40]
- the drafts were not timely deposited within the time period prescribed on the draft;[41]
- the individuals asked to be paid by check;[42]
- the individuals owned less or more acres than anticipated in the draft, thus causing a re-draft or check request;[43]
- the individuals did not own any minerals whatsoever;[44] and
- the individuals failed to sign or return an oil and gas lease.[45]

However, even if the Court were to assume that Chesapeake made a unilateral decision to breach all of the leases for the potential class members because of economic reasons, class certification would still not be appropriate.

In their Motion for Class Certification, Plaintiffs argued that the leases and drafts were delivered contemporaneously to Chesapeake's agent and, thus, that they should be construed together. In fact, Plaintiffs' expert, Celia Flowers ("Flowers"), stated in her expert report that she understood that "the lease was executed by [Merrill and Lucille Witt] and delivered directly to the agent for Chesapeake contemporaneously with the delivery by Chesapeake to the Witts of the draft executed by the land broker/agent for Chesapeake."[46] Accordingly, Flowers opined, and Plaintiffs argued, that "[w]here the contract between the parties consists of the lease and the

---

[39] *See, e.g.*, PX7 as it relates to Sharon Adams at CHK00010440 ("title failure"); Alice Bacon at CHK00010148 ("title failed"); Harold Brown at CHK00010169 ("title unverifiable").

[40] *See, e.g.* PX7 as it relates to Case & Kindra Brown at CHK00010290 ("leased with Fourstar"); Jason & Kristen Utley at CHK00011884 ("already under lease"); Billie Fields at CHK00012462 ("already leased").

[41] *See, e.g.*, PX 7 as it relates to Betty Bailey at CHK00010091 ("not timely deposited").

[42] *See, e.g.*, PX7 as it relates to Michael Augustos at CHK00010381 ("doing a check request"); Barbara Ficus Trust at CHK00012379 ("doing check"); Colley et al. at CHK00010298 ("doing a check request").

[43] *See, e.g.*, PX7 as it relates to Joe Fields at CHK00012405 ("following complete title Lessor has less net acreage, Lessor requested payment by check"); Kay Goodwyn at CHK00012287 ("draft cancelled due to title change in net acreage"); L.M. Harris at CHK00008201 ("they just told me he owns 50% of minerals").

[44] *See, e.g.*, PX7 as it relates to Dwayne & Barbara Holland at CHK00013077 ("they don't own the mineral"); Mario & Dalia Sanchez at CHK00011430 ("Cancel. Mineral Reservation.") and CHK00011433 ("There is a 100% mineral reservation from the developer of the land."); Paul and Billye Stephens at CHK00011552 ("cancel draft, not sure if they own the minerals).

[45] *See, e.g.*, PX7 as it relates to 1A Smart Start at CHK00197118 ("never received signed documents"); Jerry & Elizabeth Dancer at CHK00012946 ("Davis Land does not have the signed original corrected lease") and CHK00012947 ("no one can find a copy of the corrected lease"); Nissan North America at CHK00013380 ("never received signed documents").

[46] PX8, Declaration of Celia C. Flowers at 8-4, ¶ 3.

'draft', the draft must be read together with the lease to explain the cash bonus in hand paid."[47] The amount of the drafts, thus, was the consideration for executing the leases and the evidence of the damages owed as a result of the breach. However, when confronted with the Texas Supreme Court's holding in *Sun Exploration and Production Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987), that a provision in a bank draft, "15 days after sight and upon approval of title," presented a condition precedent to both formation of a contract and liability on the draft, Plaintiffs made an about-face and argued that the leases and drafts must be construed separately.

In *Sun Exploration*, the Texas Supreme Court held that "a contemporaneously exchanged draft and deed must be construed together." 728 S.W.2d at 37 (citing *Puckett v. Hoover*, 202 S.W.2d 209, 211 (Tex. 1947)); *see also Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) ("Separate instruments contemporaneously executed as a part of the same transaction and relating to the same subject matter may be construed together as a single instrument"). The court then found that language on the face of the draft that the draft was payable "15 days after sight and upon approval of title" made approval of title a condition precedent to the formation of an oil and gas lease. *Sun Exploration*, 728 S.W.2d at 37. "Where the grantee imposes certain conditions precedent to acceptance, title does not pass under the deed until fulfillment of such conditions. The draft effectively protected Sun against paying for the property if it disapproved the title." *Id.* (citations omitted). Under *Sun Exploration*, if the drafts and leases were contemporaneously exchanged, as Plaintiffs originally contended, they would have to be construed together, and the language on the drafts that they were payable "with approval of title" would create a condition precedent to the formation of the leases. Thus, to win on a breach of contract claim, each class member would have to prove, on an individual basis, that Chesapeake

either approved title or waived the condition precedent of approval of title. This type of individualized, fact-intensive inquiry is inappropriate for class treatment.

To avoid these problems and the holding in *Sun Exploration*, Plaintiffs abandoned their original contention that that the leases and drafts were contemporaneously exchanged and should be construed together. Instead, Plaintiffs argued in their reply brief and at the class certification hearing that the leases were not executed contemporaneously with the drafts and that *Sun Exploraiton* does not apply.[48] Plaintiffs now take the position that the leases stand on their own and should not be construed along with the drafts and that the drafts are merely evidence of the amount of the cash bonuses to be paid: "First, because the drafts were not executed contemporaneously with the Lease, second, because they were not referred to in the Lease, and third because there was no consideration given to modify the leases."[49] Accordingly, Plaintiffs argue that the drafts do not modify the terms of the leases, which state that the leases are binding when executed and contemplate a cash payment, not a draft. Plaintiffs, thus, contend that the language in the drafts stating that they are "[p]ayable on or before __ business days sight with approval of title and form of _____ agreement,"[50] does not create a condition precedent to the formation of the leases.

Even if Plaintiffs are legally correct, determining whether the drafts created conditions precedent to the formation of the leases for each individual class member would require an individual determination of whether the lease and draft were executed contemporaneously as a part of the same transaction in each circumstance as well as whether there was consideration

---

[48] *See* Dkt. No. 62, Plaintiffs' Reply Brief at 5 ("The drafts merely evidence the amount of cash bonuses. They do not modify the terms of the Lease. First, because the drafts were not executed contemporaneously with the Lease . . ."); Dkt. No. 106, Hearing Transcript at 18:21-23 (Plaintiffs' counsel stated: "The lease stands on its own, Your Honor. We believe that the lease stands on its own, that the draft is not to be read in conjunction.").

[49] Dkt. No. 62, Plaintiffs' Reply Brief at 5.

[50] *See, e.g.*, PX 1B, Merrell & Lucille Witt Bank Draft at 1B-1; PX 2B, Eugene & Sharon Witt Bank Draft at 2B-1; PX 3B, Paula & Larry Pigg Bank Draft at 3B-1; and PX 4B, Joseph and Deborah Campbell Bank Draft at 4B-1.

given to modify the lease—i.e. to determine whether the terms of the bank draft modify the lease.    In addition, Plaintiffs' argument that the leases and drafts were not contemporaneously exchanged and should not be construed together gives rise to a statute of fraud defense as to the formation of each individual lease.  An oil and gas lease is a conveyance of real property subject to the statute of frauds.  *Douglass v. Texas-Canadian Oil Corp*., 174 S.W.2d 730, 731 (Tex. 1943); *see also* TEX. BUS. & COM. CODE § 26.01.  Citing the Texas Supreme Court's holding in *Dougless*, Defendants argue that a lessor cannot enforce an oil and gas lease not signed by the lessee, and exchanged separate from, and without reference to, an existing bank draft.  *See Douglass*, 174 S.W.2d at 731.  Defendants, thus, argue that, for any lease not contemporaneously exchanged with a draft, that lease violates the statute of frauds because it is not signed by the lessee, Chesapeake.  *See Howell v. Aspect Resources, LLC*, 2011 WL 3556926, at *2 (Tex. App.—Beaumont Aug. 11, 2011, no pet. h.) (holding that, "to be enforceable, oil and gas leases must be in writing and signed by the party to be charged with the agreement.").  Litigating Defendants' statue of fraud defense would also require an individual inquiry into to the facts surrounding the execution and exchange of each lease and draft.

In the alternative, Plaintiffs argue that even if the lease and the draft are construed together, the draft still does not create a condition precedent for the lease because the bank drafts do not contain the "magic words" blessed by the Supreme Court for creating a condition precedent.  Plaintiffs rely on the Texas Supreme Court's holding in *Criswell v. European Crossroad Shopping Cr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).  *Criswell* held that "[i]n order to make performance specifically conditional, a term such as 'if', 'provided that', 'on condition that', or *some other similar phrase of conditional language* must normally be included."  *Id*. at 948 (emphasis added).  The bank drafts of the named plaintiffs state that they are payable "with approval of title and form of _____ agreement."   However, the fact that the bank drafts do not

contain one of the specifically enumerated phrases does not mean that they cannot create a condition precedent. *Criswell* makes it clear than a "similar phrase of conditional language" will create a condition precedent. *Id.*; *see also Tex. Dep't of Housing and Comm. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 930 (5th Cir. 1995) (holding that "under the following terms and conditions" was sufficient to create conditions precedent even though the phrase did not mirror the phrases enumerated in *Criswell*). "In the absence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties." *Hohenberg Bros. Co. v. George E. Gibbons and Co.*, 537 S.W.2d 1, 3 (Tex. 1976). Courts have held that the phrases "upon approval of title", "on approval of title", and "with approval of title" in bank drafts all create conditions precedent to the formation of an oil and gas lease. *See Sun Exploration*, 728 S.W.2d at 37 (holding that phrase "upon approval of title" created condition precedent); *Broughton Assoc. Joint Venture v. Boudreau*, 70 S.W.3d 324, 328 (Tex. App.—Waco 2002, no pet.) (holding that "on approval of title" created condition precedent); *Encino Partnership v. COREnergy, L.L.C.*, 50 S.W.3d 66, 69 (Tex. App.—Corpus Christi 2001, pet. denied) (holding that "on approval of title" created condition precedent); *Wilkins v. Cheseapake Exploraiton, L.L.C.*, Case No. 9:09cv128, In the United States District Court for the Eastern District of Texas, Lufkin Division, Dkt. No. 52 at 8-9 (E.D. Tex. January 7, 2011) (unpublished) (holding that "with approval of title" created condition precedent).

Finally, Plaintiffs argue that Chesapeake is equitably stopped, or quasi stopped, from questioning the validity of the leases because it received significant financial benefits from controlling Plaintiffs' acreage with oil and gas leases. Quasi estoppel "precludes a party from accepting the benefits of a transaction and then taking a subsequent inconsistent position to avoid corresponding obligations or effects. It applies when it would be unconscionable to allow a

person or party to maintain a position inconsistent with one in which he acquiesced or from which he accepted a benefit." *Cambridge Production, Inc. v. Geodyne Nominee Corp.*, 292 S.W.3d 725, 732 (Tex.App.—Amarillo, 2009). However, determining whether Chesapeake received a benefit from a particular lease would require individualized analysis of each lease. Plaintiffs also argue that Defendants waived any conditions precedent to the lease, including approval of title, by recording the leases. Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Massachusetts Bond & Ins. Co. v. Orkin Exterm. Co*., 416 S.W.2d 396, 401 (Tex.1967). A condition precedent may be waived, *Kennedy v. McMullen*, 39 S.W.2d 168, 174 (Tex.Civ.App.—Beaumont 1931, writ ref'd), and the waiver of a condition precedent may be inferred from a party's conduct. *Ames v. Great Southern Bank*, 672 S.W.2d 447, 449 (Tex.1984). However, the Texas Supreme Court holds that recording an oil and gas lease does not constitute waiver of the condition precedent to approval of title. *See Sun Exploration*, 728 S.W.2d at 37. "[T]he mere acceptance and recordation of an oil, gas and mineral lease does not constitute such conduct inconsistent with claiming the right to approve title to the interest conveyed. . . . Thus, recordation did not waive any right of Sun to check title in accordance with the language in the draft." *Id*. Plaintiffs argue that Chapter 12 of the Civil Practice and Remedies Code, which was enacted in 1997, ten years after the Texas Supreme Court's holding in *Sun Exploration*, overruled *Sun Exploration*. *See* TEX. CIV. PRAC. & REM. CODE § 12.001 et seq. (West 2011).[51] However, nothing in the language of Chapter 12 or in its legislative history suggests that it was intended to overrule the court's holding in *Sun*

---

[51] As will be discussed in more detail later, Chapter 12 of the Texas Civil Practice and Remedies Code prohibits a person from making, presenting, or using a fraudulent document with knowledge that the document is a fraudulent claim against real or personal property with the intent that the document be given legal effect and cause plaintiff physical injury, financial injury, or mental anguish. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 12.002(a) (West 2011).

*Exploration*. Absent such proof, the Court is not inclined to find that Chapter 12 overruled a decade of clear Texas Supreme Court precedent.

Accordingly, class certification is improper because Defendants must be afforded their right to examine the circumstances surrounding the negotiation, execution, and delivery of each individual lease as well as the reasons that payment was reduced, delayed, or refused in order to determine whether defenses and counterclaims will apply in any individual leasing transaction. *See, e.g., In re Wilborn*, 609 F.3d 748, 756 (5th Cir. 2010) (noting that the predominance of affirmative defenses such as waiver or estoppel precluded class certification). Plaintiffs attempted to argue at the class certification hearing that the Defendants had waived their defenses on a classwide basis. The Court, however, is not convinced. Additionally, the Supreme Court recently rejected a similar argument in *Wal-Mart*. "Because the Rules Enabling Act forbids interpreting Rule 23 'to abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 131 S.Ct. at 2561 (internal citation omitted). Investigating and litigating each of Chesapeake's potential defenses to the breach of contract claim as to each individual class member would require numerous mini-trials, defeating predominance.

For the reasons discussed above, the Court finds that individual issues predominate with respect to Plaintiffs' breach of Contract claim against Chesapeake and that class certification is not appropriate. Because Plaintiffs' tortious interference claim against Chesapeake Operating and Chesapeake Energy depends on the formation of a contract between each potential class member and Chesapeake, the same individual inquiries and issues that predominate in the breach of contract claim also predominate in the tortious interference claims against Chesapeake

Operating and Chesapeake Energy. Accordingly, class certification of Plaintiffs' tortious interference claim is also inappropriate.

## B. Chapter 12 Claim

As an alternative to their breach of contract and tortious interference claims, Plaintiffs allege that if the oil and gas leases for those class members who were never paid any lease bonus are found not to be effective or binding or not to have conveyed minerals, then the filing of these leases in the public record by Chesapeake constitutes a violation of Chapter 12 of the Civil Practice and Remedies Code. Texas Civil Practice and Remedies Code § 12.002(a) states:

> A person may not make, present, or use a document or other record with:
>
> (1)  Knowledge that the document or other record is a fraudulent court record or a fraudulent line or claim against real or personal property or an interest in real or personal property;
> (2)  Intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or any other entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and
> (3)  Intent to cause another person to suffer:
> >(A) Physical injury;
> >(B)  Financial injury; or
> >(C)  Mental anguish or emotional distress.

TEX. CIV. PRAC. & REM. CODE § 12.002(a) (West 2011). A person who violates this section is liable to each injured person for the greater of $10,000.00 or the actual damages caused by the violation, along with court costs, reasonable attorney's fees, and exemplary damages in an amount determined by the court. TEX. CIV. PRAC. & REM. CODE § 12.002(b).

Plaintiffs argue that Chesapeake knowingly made, used, and presented documents (oil and gas leases and memoranda of leases filed in the deed records of the respective counties) fraudulently claiming an interest in real property of the Plaintiffs and others similarly situated in order to cause financial injury to Plaintiffs and members of the class. To establish a violation of

19

Chapter 12, Plaintiffs will be required to show, as to each lease and/or memorandum of lease, that Defendants (1) made, presented, or used the lease with knowledge that it was a fraudulent claim against real property; (2) intended the lease or memorandum of lease to be given legal effect; and (3) intended to cause each lessor financial injury. *See* TEX. CIV. PRAC. & REM. CODE § 12.002(a); *Walker & Associates Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 848 (Tex. Appl.—Texarkana 2010, no pet.) ("to establish a fraudulent lien in this case, [plaintiff] was required to show that [defendants] (1) made, presented, or used a document with knowledge that it was a fraudulent lien; (2) intended the document be given legal effect; and (3) intended to cause [plaintiff] financial injury"). Chapter 12 "does not define the term 'fraudulent,' but generally it is a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Walker*, 306 S.W.3d at 849. There is a clear distinction between a lien or contract that is invalid and unenforceable as filed and one that is fraudulent. *See id.* ("While this lien may be invalid and unenforceable as filed, we believe there is a fact issue on whether it is fraudulent."). Accordingly, to determine whether Defendants had the requisite intent—i.e. that they filed the leases with knowledge that they were fraudulent—will require an individual determination with respect to each lease or memorandum of lease as to whether Chesapeake, or its agents, knew that the lease or memorandum was not only invalid, but fraudulent, at the time each lease was filed.

In addition, because the damages for a violation of Chapter 12 are the greater of $10,000.00 or the actual damages for each violation, calculating damages will require the fact finder to determine what the actual damages are as a result of the violation to establish whether the actual damages are higher than the statutory minimum damages. This will entail a fact-intensive, individualized inquiry into whether and to what extent each individual lessor suffered financial injury as a result of Defendants' alleged fraudulent filing of the leases and

memorandum of leases. The numerous individual inquiries that will be required to determine whether Chesapeake knew that each lease or memorandum of lease was fraudulent when filed as well as the determination of the actual damages resulting from the filing of each individual lease will cause the proposed class to degenerate into a series of individual, mini trials. Accordingly, classwide issues do not predominate, and class certification of Plaintiffs Chapter 12 claim is inappropriate.

**V.      Certification under 23(b)(1) and 23(b)(2)**

In their motion for class certification, Plaintiffs make a cursory, alternative argument that if the class is not certified under Rule 23(b)(3), then the class is certifiable under Rule 23(b)(1) and/or (b)(2). However, Plaintiffs provide no support for certification of the class under either Rule 23(b)(1) or (b)(2), and certification of a class under either section is clearly inappropriate.

**VI.     Conclusion**

For the reasons discussed above, the Court DENIES Plaintiffs' Motion for Class Certification (Dkt. No. 37).

SIGNED this 12th day of September, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE